**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RIAASA MUNTAZ,

                Plaintiff,

     -against-

FAIRYGODBOSS INC.,
ROMY NEWMAN, individually,
MAURA BRADLEY, individually,
DANNA HENDRICKSON, individually,

                Defendants.

**Case No. 21-CV-9386**

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Riaasa Muntaz, by her attorneys, Crumiller P.C., as and for her complaint against Fairygodboss, Inc. ("FGB" or "the Company"), Romy Newman ("Newman"), Maura Bradley ("Bradley") and Danna Hendrickson ("Hendrickson") (collectively, "Defendants")), alleges as follows:

### NATURE OF ACTION

1.     Defendants treated Plaintiff disparately, and worse, than her white counterparts and subjected to a race-based hostile work environment. Plaintiff made numerous protected complaints of discrimination to her employers about the racially hostile nature of her employment. Each time Plaintiff made a race-based complaint of discrimination, Defendants retaliated against her. Ultimately, Defendants retaliatorily placed Plaintiff on a performance improvement plan ("PIP") within a week of her final race-based complaint, and then upon learning Plaintiff retained counsel, unlawfully terminated her employment.

2.     Plaintiff brings this action to remedy claims of race discrimination and retaliation in violation of 42 U.S.C. § 1981 *et seq.* ("§ 1981"); the New York State Human Rights Law,

Executive Law § 296[1] ("NYSHRL"); and the New York City Human Rights Law, Administrative Code § 8-107[1][a] ("NYCHRL").

## PARTIES

3.      Plaintiff is an individual woman of Indo-Caribbean descent who is domiciled in New York County, New York. She was employed by FGB from October 5, 2020 to August 20, 2021. Plaintiff was an eligible employee as that term is defined under the applicable statutes, and is entitled to the remedies of said statutes for the purposes of the claims brought in this complaint.

4.      Defendant Fairygodboss Inc. is a foreign business corporation with its principal place of business located at 15 W 38th St, New York, NY 10018. The Company provides career connections, job postings, reviews, networking events and advice for women in the workplace.

5.      Defendant Romy Newman is the President and Co-Founder of FGB who, upon information and belief, is domiciled in New York County, New York.

6.      Defendant Maura Bradley is the Vice President of Sales at FGB who, upon information and belief, is domiciled in New York County, New York.

7.      Defendant Danna Hendrickson is the Head of Demand Generation at FGB who, upon information and belief, is domiciled in Kings County, New York

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1343, as Plaintiff has asserted claims that arise under federal laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

9.     Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2) as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     On October 4, 2021, Plaintiff filed a timely Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

11.     On April 22, 2022, Plaintiff filed a timely amended Charge with the EEOC alleging additional claims under the Americans with Disabilities Act of 1990 (the "ADA").

12.     The EEOC has not yet issued Plaintiff a Notice of Right to Sue. After the EEOC issues a Notice of Right to Sue, Plaintiff will seek to amend this Amended Complaint to include causes of actions under Title VII and the ADA.

## FACTUAL ALLEGATIONS

### *Plaintiff Joins FGB's Majority-White Team*

13.     FGB is the largest career community job board for women; they purport to live out their "mission of improving the workplace through greater transparency, while also helping major US companies like Apple, Johnson & Johnson, Home Depot, and Deloitte to attract, engage, and hire talented, ambitious, diverse and career-focused women, especially in hard-to-fill technology roles."

14.     Prior to her work for FGB, Plaintiff had committed much of her career to empowering diverse communities through grassroots organizing and outreach. As such, Plaintiff was attracted to FGB's public posture of diversity and inclusion. At the time she applied, Plaintiff had no idea FGB was a majority-white corporation that condoned open hostility towards their few employees of color.

15.     Indeed, upon information and belief, approximately 60% of the company is white. Even more staggering is the racial disparity in the company's leadership who, upon information and belief, has no Black or Hispanic individuals in positions at director-level or above.

16.     On October 5, 2020, Plaintiff began working at FGB as a Hunter Sales Development Representative ("Hunter SDR") in the Company's Demand Generation Team, reporting to Hendrickson.

17.     In her capacity as a Hunter SDR, Plaintiff scheduled meetings with accounts and executed targeted campaigns to prospective customers to connect their needs with optimal solutions within FGB.

18.     Plaintiff threw herself into her career and excelled from the moment she started, as evidenced by her revenues, including $189,400 in Q1 2021 and $225,000 in Q2 2021. Plaintiff achieved success in this position through outboard campaigns and engagement with leadership at Fortune 500 companies and mobilization of collaborative tools including Salesforce, G Suite, LinkedIn Sale Navigator, Seamless.ai, and MixMax.

***FGB Treats Plaintiff as Inferior to her White Counterparts; Calls her Dishonest and Destructive***

19.     Within a few months of commencing her employment, Plaintiff noticed that members of the Company – in particular her direct manager, Hendrickson – constantly questioned her professionalism and regularly ignored her insights and requests altogether. This was in clear contrast to the way she treated her white counterparts.

20.     By way of example only, on November 20, 2020, after a one-on-one meeting, Hendrickson accosted Plaintiff and began repeatedly questioning her in a loud and condescending tone: "Do you *even* want to be on the Demand Generation team?"

21.     Plaintiff was perplexed, as she had made no prior indication that she was unhappy on the team or desired any shift in her role. There was absolutely no legitimate reason why Hendrickson would doubt Plaintiff's commitment to her work.

22.     Moreover, Hendrickson did not propose any alternative roles for Plaintiff during this sudden confrontation, leading Plaintiff to believe that her employment was in jeopardy. Plaintiff left this discussion feeling belittled, demoralized and soon-to-be unemployed.

23.     Plaintiff suspected the incident was driven by racial animus, considering she never witnessed Hendrickson talk down to her similarly situated white colleagues in such a condescending and aggressive fashion.

24.     As such, in early November 2020, Plaintiff complained about the incident to People and Culture Director, Dan Sprock. She told Sprock that Hendrickson had demonstrated an unfounded aggression towards her that made her uncomfortable. She also requested to be placed on a new team.

25.     FGB failed to place Plaintiff on a new team or take any corrective action in response to the HR complaint. Instead, in late November 2020, FGB retaliated by removing Plaintiff from her role as a Hunter SDR.

26.     At FGB, a Hunter SDR is tasked with finding new accounts and partnering with enterprise account executives who have access to more lucrative deals. Plaintiff was effectively demoted to a Sales Development Representative ("SDR"). SDRs are assigned two account executives and can only work on named accounts designated to them by their account executives.

27.     This adverse change directly undermined her ability to reach out to accounts, which reduced her scheduled client meetings and total revenues.

28.     Plaintiff made several efforts to inform FGB that she needed more access and support to do her job properly, and also raised complaints that she was being treated disparately as compared to her colleagues.

29.     For example purposes only, by email dated January 19, 2021, she notified Hendrickson that she had been assigned fewer leads and accounts than any of her SDR counterparts.

30.     Instead of offering any assistance or addressing the disparate treatment, Hendrickson ignored the email altogether.

31.     With these issues left unabated by Hendrickson, Plaintiff began to feel more isolated in the Company. This caused her substantial emotional distress including feelings of stress, depression, anxiety, and panic attacks.

32.     Hendrickson also regularly submitted inaccurate sales activity numbers for Plaintiff to FGB's weekly Sales Meeting Deck[1]. These numbers gave false projections of Plaintiff's accomplishments, and made it appear she was below her weekly quotas for emails sent and meetings booked.

33.      For example purposes only, on or about February 15, 2021, Hendrickson submitted email metrics for Plaintiff that were off by approximately 100-200 emails. When Plaintiff questioned Hendrickson about the inaccurate metrics, Hendrickson stated it was an issue made by the FGB's salesforce division. However, Hendrickson never rectified these inaccuracies before the following weekly sales meeting, making it appear Plaintiff was below her quotas, when that was not the case.

---

[1] At FGB, the "Sales Meeting Deck" is a collection of metrics outlining emails sent and meetings booked by SDRs. The Sales Meeting Deck is used to measure KPIs and outline the company's weekly sales meeting, and monthly "All Hands" meetings, where the Company discusses what is going on in the business globally and offer company updates to employees.

34.     Meanwhile, in February 2021, Hendrickson began soliciting negative feedback from Plaintiff's colleagues about her performance in an effort to engineer her termination. Hendrickson never solicited performance reviews – and particularly never solicited negative reviews – of Plaintiff's similarly situated white colleagues.

35.     On February 23, 2021, Hendrickson confronted Plaintiff with the reviews she had solicited and critiqued her personality as off-putting, stating Plaintiff came off "harsh" and "short."

36.     Plaintiff recognized these critiques as race-based aggressions, as she never observed Hendrickson police the tone of her white counterparts. Indeed, Plaintiff was no more "harsh" or "short" than her similarly situated white colleagues.

37.     Plaintiff responded that the criticisms seemed "very subjective" and that she felt she was being "vilified."

38.     On February 25, 2021, Plaintiff submitted a written HR complaint to Sprock regarding the incident, stating she felt she was "being treated unfairly in [the] workplace," that she felt targeted by Hendrickson's "bias," and that Hendrickson "continued to look for reasons to label [her]."

39.     Plaintiff also noted that her previous HR complaint to Sprock - regarding Hendrickson - was never resolved and resulted in an immediate demotion. Plaintiff averred the demotion, coupled with a lack of support from Hendrickson, was undermining her ability to meet her revenue quotas. Plaintiff then requested, again, to be transferred to a different team under new leadership so that she could work in an environment free of unlawful discrimination.

40.     FGB again refused to transfer Plaintiff to a new team, with Sprock stating that FGB needed her on the team to generate revenue. There was no investigation or remedial action taken in response to Plaintiff's protected complaint.

41.     Instead, in or about early March 2021, FGB retaliated by removing one of Plaintiff's account executives that she referenced in her complaint, but failed to replace her, leaving Plaintiff as the only SDR in the company with only one account executive.

42.     Considering Plaintiff could only work on named accounts assigned to her by her account executives, removing one reduced her access to company accounts by half. None of Plaintiff's white colleagues were forced to work with only one account executive.

43.     Defendants' adverse employment action to remove Plaintiff's account executive adversely impacted her performance and exacerbated her stress and anxiety.

44.     As Plaintiff's work-related stress continued to increase, her physical health began to deteriorate, and she began experiencing migraines, shortness of breath, and fatigue.

45.     As a result, on April 21, 2021, Plaintiff visited her hematologist for diagnostic testing. Plaintiff's doctor informed her that Plaintiff's blood pressure was spiking due to stress, and that she should see a cardiologist.

46.     Over the following days, Plaintiff's health declined precipitously.

47.     On April 27, 2021, Plaintiff had no choice but to go to the emergency room to treat her stress-related medical conditions.

48.     At the emergency room, Plaintiff was informed that she had a blood pressure at the dangerous level of 194/111 and was suffering from hypertension.

49.     Plaintiff's physician prescribed her medication to treat her stress-related symptoms and advised her to take time off from work to reduce her stress.

50.     That same day, Plaintiff informed Sprock of her medical condition, her emergency room treatment, and doctor's direction to take occasional time off from work.

51.     Plaintiff took medical leave on April 27, 2021, April 28, 2021, April 29, 2021, and April 30, 2021; FGB was aware of and approved this time off. Plaintiff also provided a doctor's note for these absences.

52.     On May 4, 2021, Plaintiff informed Hendrickson of her hypertension, her trip to the emergency room, and her continued need for occasional time off from work as directed by her physician.

53.     Plaintiff requested additional medical leave for May 5, May 11-12, May 25, and June 21, 2021, and provided FGB with medical documentation substantiating the need for her leave; FGB was aware of and approved this medical leave.

54.     Unfortunately, the occasional medical time off did not abate the growing tension Plaintiff was subjected to while at work. Without any help from HR, the discriminatory and retaliatory treatment continued, resulting in an increasingly hostile work environment.

55.     Plaintiff grew more and more uncomfortable working with Hendrickson, as she feared even the slightest misstep would result in further retaliation and interference with her working conditions. She also grew detached from her colleagues as she knew Hendrickson routinely encouraged them to criticize her performance.

56.     On June 23, 2021, Plaintiff's fears came to fruition when Hendrickson accused her of stealing an account from her coworker, and chastised Plaintiff for being "dishonest," "destructive," and "negative." In reality, there had only been a minor misunderstanding between Plaintiff and her colleague that was resolved quickly, and there was no need for Hendrickson to make such hurtful and demeaning accusations.

57.     Plaintiff was stunned and utterly demoralized that her direct supervisor had attacked her character based on a misunderstanding, essentially branding her as a thief and a liar.

58.     Upon information and belief, Hendrickson has never called any of Plaintiff's similarly situated white colleagues "dishonest," "destructive," or "negative."

59.     As a woman of color, it was clear to Plaintiff that Hendrickson believed she was "dishonest" or that she would "steal" because of her race and because she was not white.

***Plaintiff Submits her Third HR Complaint and is Subjected to Further Retaliation and Terminated.***

60.     On June 28, 2021, Plaintiff garnered the courage to make a third HR complaint regarding the escalating discrimination, retaliation, and hostile work environment, including Henrickson's "racist microaggression[s]" toward her. She also added that this was her third HR complaint, and that HR's chronic inaction coupled with Hendrickson's aggression towards her was "creating a hostile work environment."

61.     In response, Plaintiff was informed that an investigation would take place and a meeting would be scheduled with her shortly.

62.     In or about early July 2021, SDRs received their annual performance appraisals from FGB. Performance appraisals are conducted through an online portal that allows peer reviews amongst SDRs and provides one review from an SDR's direct report, in Plaintiff's case she should have received a review from Hendrickson. However, she never received a performance review from Hendrickson.

63.     Upon information and belief, Plaintiff was the only SDR to not receive a performance appraisal from her direct report.

64.     Plaintiff found the disparate treatment demonstrated by FGB's failure to offer her a performance appraisal terrifying. Not only did this immediately follow her third HR complaint alleging racism but, at this point, she was fully aware of FGB's propensity for retaliation.

65.     The investigation of Plaintiff's third HR complaint was transferred to President and Co-founder, Newman, and Vice President of Sales, Bradley, who both met with Plaintiff on July 7, 2021.

66.     Upon information and belief, neither Newman nor Bradly has any experience investigating complaints of discrimination. It was unique for Newman and Bradly to conduct such an investigation, which was usually conducted by Sprock, or another human resource representative.

67.     In this meeting, Plaintiff tried to outline her issues with Hendrickson's communications and the key terms she found offensive and racist.

68.     In response, Newman dismissed her concerns out of hand, stating that she was "reading something that isn't on the page." Newman then referred to Plaintiff stealing an account (words clearly from Hendrickson's mouth as Plaintiff never stole any account) and referred to the multiple HR complaints Plaintiff had made, outlandishly stating that Plaintiff's complaints were somehow not worthy of any remedial action by FGB.

69.     Two days later, on July 9, 2021, Newman and Bradley again met with Plaintiff to inform her that the "investigation" had yielded no findings of misconduct.

70.     Plaintiff suggested that someone at least counsel Hendrickson regarding how the language she used might be received "by someone like [her]self," referring to her race. Newman dismissed this suggestion out of hand and told Plaintiff to "do it [her]self."

71.     In yet another blatant act of retaliation, just one week later on July 13, 2021, FGB placed Plaintiff on a PIP.

72.     On that date, Plaintiff met with Hendrickson and Bradley who stated the PIP was necessitated by alleged performance deficiencies, namely that she had not been booking the minimum number of outboard meetings in recent weeks.

73.     Baffled, Plaintiff reminded Hendrickson and Bradley that she had recently taken medical leave, which the Company was aware of, and asked if she was being penalized for that. Hendrickson responded: "Sick time is… built into the numbers."

74.     Plaintiff replied that the PIP was "false," "not objective," and "not fair." She questioned why these purported issues had not been raised in her and Hendrickson's prior one-on-one meetings, and asked Hendrickson why she refused to support her.

75.     Realizing Plaintiff intended to make yet another race-based complaint regarding Hendrickson treatment towards her, Bradley interjected: "This meeting has nothing to do with Hendrickson."

76.     Plaintiff then stated plainly that the PIP was in retaliation to her HR complaints; neither Hendrickson nor Bradley responded to this.

77.     Plaintiff then raised the disparate treatment in account executives, stating it was "concerning to her" that she was required to work "twice as hard" as any other SDR. To this, Hendrickson responded "it's best we don't talk about other SDRs," effectively shutting down Plaintiff's complaint of discrimination

78.     Plaintiff ended the meeting stating, "I want to be treated equitably." Bradley glibly responded "you are," a statement clearly belied by FGB's actions.

***Muntaz's Mental and Physical Health Deteriorates During Her PIP; FGB Fails to
Accommodate and Unlawfully Terminates Her***

79.     Muntaz recognized the PIP as pretextual and retaliatory, which caused immense

stress as it seemed her termination was all but certain.

80.     This stress presented itself in the same migraines and fatigue that previously

necessitated her visit to the emergency room. Muntaz also began suffering from severe

emotional distress that resulted in sleeplessness, depression, terror and helplessness.

81.     On July 26, 2021, Munatz spoke with her physician who advised her to take

medical leave. That same day, Muntaz emailed her request for medical leave from July 26

through 27 to Sprock and Hendrickson and provided a note from her physician.

82.     On July 28, 2021, still unwell, Muntaz emailed Sprock and Hendrickson

informing them she was "not feeling well and [] symptomatic," and stated she could not come

in.

83.     The next day, July 29, 2021, Muntaz emailed Sprock and Hendrickson stating

she was still "feeling unwell" and could not come in that day, or the following day.

84.     On August 2, 2021, Muntaz returned to work. No one at FGB engaged with

Muntaz in any discussion to determine the extent of her medical conditions, or any

accommodation which could be made to enable her to continue to work.

85.     On August 5, 2021, Muntaz met with board-certified psychiatrist for psychiatric

evaluation. Muntaz was diagnosed with anxiety, recurrent major depressive disorder, trauma

and a stressor-related disorder.

86.     On August 9, 2021, Muntaz's psychiatrist forwarded FGB a letter informing

them of her diagnoses.

87.     That same day, the undersigned law firm sent FGB an email informing them that we had been retained by Muntaz with respect to claims of racial discrimination and retaliation. The email further stated that, "for the sake of her mental health," Muntaz required medical leave from August 9 through August 13.

88.     Again, FGB failed to engage in any interactive process with Muntaz or her attorneys in order to assess the extent to which her health affected her work, or what reasonable accommodation could be implemented in order for Muntaz to continue her work.

89.     Instead, on August 13, 2021, FGB's counsel informed this office that the Company terminated Muntaz. Muntaz continued to work until August 20, 2021.

90.     FGB proffered an alleged failure to meet the expectations set forth in her PIP as an excuse for the explicitly unlawful termination. This excuse is belied by the fact that Muntaz was on medical leave for 9 days of the 30-day pip – without any accommodation – and never given an earnest opportunity to succeed on the PIP.

91.     Muntaz's termination is just another example of the pattern of retaliatory treatment by the Company in response to her efforts to oppose their unlawful and discriminatory practices.

### *Effect on Plaintiff*

92.     The hostile environment she suffered, and the subsequent loss of her job, have had a significant psychological and physical impact on Plaintiff.

93.     Plaintiff's hypertension continues to result in migraines, shortness of breath, and fatigue. Plaintiff is receiving treatment from a neurologist to mitigate these symptoms.

94.     Plaintiff's emotional distress has resulted in hair loss, panic attacks, feelings of hopelessness, suicidal thoughts, and sleeplessness. To address the substantial emotional distress

Defendants' unlawful actions have caused, Plaintiff has obtained mental health treatment from a licensed psychiatrist.

95.     After consultations with her psychiatrist, Plaintiff has been diagnosed with anxiety, recurrent major depressive disorder, trauma and a stressor-related disorder.

96.     As a result of Defendant's unlawful and discriminatory acts and omissions enumerated herein, Plaintiff has suffered irreparable injury including monetary damages, mental anguish, and emotional distress.

## FIRST CAUSE OF ACTION:
### Discrimination in Violation of the 42 U.S.C. § 1981
### *Against FGB*

97.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

98.     Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment by, *inter alia*, subjecting her to disparate working conditions and improperly terminating her employment on the basis of her race in violation of 42 U.S.C. § 1981.

99.     Defendant's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional and physical distress.

100.     Defendant acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

101.     Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and disbursements.

## SECOND CAUSE OF ACTION:
### Retaliation in Violation of the 42 U.S.C. § 1981
### *Against FGB*

102.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

103.     Defendant unlawfully retaliated against Plaintiff in the terms and conditions of her employment and improperly terminating her employment on the basis of race, in violation of 42 U.S.C. § 1981.

104.     Defendant's unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional and physical distress.

105.     Defendant acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

106.     Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## THIRD CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL
### *Against All Defendants*

107.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

108.     Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment by, *inter alia*, denying her a reasonable accommodation on the basis of her perceived and/or actual physical and mental disabilities, subjecting her to disparate working conditions on the basis of her race and/or disabilities, and improperly terminating her employment on the basis of her race and/or disabilities in violation of the NYSHRL.

109.     Newman, Bradley and Hendrickson are personally, directly and individually liable, in that they aided and abetted FGB in its unlawful discriminatory acts against Plaintiff, in violation of NYSHRL § 296 (6).

110.     Alternatively, in terms of the economic realities of the workplace, Newman, Bradley and Hendrickson are personally, directly, and individually liable as employers for the unlawful discrimination against Plaintiff, in violation of NYSHRL § 296 (1).

111.     Defendants' unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional and physical distress.

112.     Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

113.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

### FOURTH CAUSE OF ACTION:
### Retaliation in Violation of the NYSHRL
### *Against All Defendants*

114.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

115.     Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and terminated her employment on the basis of race and/or disabilities, in violation of NYSHRL.

116.     Newman, Bradley and Hendrickson are personally, directly and individually liable, in that they aided and abetted FGB in its unlawful retaliatory acts against Plaintiff, in violation of NYSHRL § 296 (6).

117.    Alternatively, in terms of the economic realities of the workplace, Newman, Bradley and Hendrickson are personally, directly, and individually liable as employers for the unlawful retaliation against Plaintiff, in violation of NYSHRL § 296 (1).

118.    Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional and physical distress.

119.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

120.    Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

### FIFTH CAUSE OF ACTION:
**Discrimination in Violation of the NYCHRL**
***Against All Defendants***

121.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

122.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment by, *inter alia*, denying her a reasonable accommodation on the basis of her perceived and/or actual physical and mental medical conditions, subjecting her to disparate working conditions on the basis of her race and medical conditions, and improperly terminating her employment on the basis of her race and medical conditions in violation of the NYCHRL.

123.    Newman, Bradley and Hendrickson are personally, directly and individually liable, in that they aided and abetted FGB in its unlawful discriminatory acts against Plaintiff, in violation of NYCHRL § 8–107 (6).

124.     Alternatively, in terms of the economic realities of the workplace, Newman, Bradley and Hendrickson are personally, directly, and individually liable as employers for the unlawful discrimination against Plaintiff, in violation of NYCHRL § 8–107 (1)(a).

125.     Defendants' unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional and physical distress.

126.     Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

127.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## SIXTH CAUSE OF ACTION:
### Retaliation in Violation of the NYCHRL
### *Against All Defendants*

128.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

129.     Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and terminated her employment on the basis of her race and/or disabilities, in violation of NYCHRL.

130.     Newman, Bradley and Hendrickson are personally, directly and individually liable, in that they aided and abetted FGB in its unlawful retaliatory acts against Plaintiff, in violation of NYCHRL § 8–107 (6).

131.     Alternatively, in terms of the economic realities of the workplace, Newman, Bradley and Hendrickson are personally, directly, and individually liable as employers for the unlawful discrimination against Plaintiff, in violation of NYCHRL § 8–107 (1)(a).

132.    Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

133.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

134.    Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment that:

a)    declares that the discriminatory actions, practices, and policies of Defendants as set forth above violated § 1981, the NYSHRL and the NYCHRL;

b)    declares that the retaliatory actions, practices and policies of Defendants set forth above violated the § 1981, the NYSHRL, and the NYCHRL;

c)    awards monetary damages to Plaintiff to compensate her for the discrimination and retaliation she experienced, including economic damages, and damages for emotional distress;

d)    awards Plaintiff punitive damages;

e)    awards Plaintiff pre- and post-judgment interest in the amount of 9 percent *per annum*;

f)    awards Plaintiff reasonable attorneys' fees and costs; and

g)    grants such other relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.


Dated: Brooklyn, New York
        April 29, 2022

                                        Respectfully submitted,

                                        Crumiller P.C.

                                        Travis Pierre-Louis
                                        16 Court St, Ste 2500
                                        Brooklyn, NY 11241
                                        (212) 390-8480
                                        travis@crumiller.com
                                        Attorneys for Plaintiff